976 F.2d 737
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Fred PERRY, Petitioner-Appellee,
v.
STATE of Montana, Respondent-Appellant.
 No. 91-35285.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 8, 1992.
Decided Aug. 18, 1992.
As Amended Oct. 6, 1992.
 
 Before EUGENE A. WRIGHT, WILLIAM A. NORRIS and CYNTHIA HOLCOMB HALL, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 The State of Montana appeals the district court's order granting Fred Perry's petition for a writ of habeas corpus unless he is afforded a new trial on the ground that the prosecution withheld exculpatory materials in violation of Brady v. Maryland, 373 U.S. 83 (1963). We affirm.
 
 
 3
 * Perry was convicted of second-degree murder in October 1971. The primary witness against Perry was Michael Stillings, who testified that he and Perry had raped Vicki Renville in February 1971 and that Perry had killed her to prevent her from turning them in. Perry was sentenced to life in prison.
 
 
 4
 Before the trial, Perry's counsel requested that the prosecution produce any statements made by Stillings indicating that Stillings rather than Perry actually committed the murder. At the start of the trial, Perry's attorney John Stephenson told the court that the county attorney had voluntarily disclosed the items requested or had indicated that the matters requested did not exist.
 
 
 5
 After Perry was convicted, the court appointed attorney Ralph Randono to represent Perry in post-trial motions and on appeal. Prior to the sentencing hearing, a sheriff's deputy showed Perry a letter that Stillings had written to "Marilou, Mona, and Margo [Brown]" in which Stillings said the killing was an accident. Perry also overheard talk about a written confession that Stillings had given when he was apprehended in Seattle. Randono identified these items in making a motion for a new trial, which was denied. According to Randono's uncontroverted testimony, the "county attorney informed him that the state did not have in its possession any document memorializing Stillings' Seattle confession or a letter from Stillings to Mona Brown." Perry v. Montana, No. CV-88-197-GF-JDS-JMB, at 11 (D. Montana filed Jan. 11, 1991). Randono did not, therefore, raise the Brady issue on appeal. In 1973, the Montana Supreme Court affirmed Perry's conviction and the denial of his motion for a new trial.
 
 
 6
 Stillings recanted his testimony against Perry in 1986. He told authorities that he alone had raped and killed the victim. The court appointed new counsel who obtained a court order permitting access to a file in the sheriff's office in Cascade County, Montana. In that file they found: (1) a police report dated March 12, 1971 from law enforcement officers in Seattle describing an oral statement by Stillings in which he claimed that the girl's death was accidental and did not mention Perry; (2) a report prepared by sheriff's deputies in Montana that described Stillings' apprehension in Seattle and his statements to Seattle authorities; (3) a letter dated March 16, 1971 from Stillings to "Marilou, Mona, and Margo" in which he said the killing was an accident; (4) a note dated March 22, 1971 from Stillings to an unidentified person asking that person to back up Stillings' alibi claim; (5) an undated letter from Stillings to Randy Braden asking him to back up Stillings' alibi claim; and (6) a letter dated May 13, 1971 from Stillings to his brother Jerry. Neither Perry nor his attorneys had any knowledge of items 4-6 until 1987.
 
 
 7
 On the basis of Stillings recantation and the materials discovered in the sheriff's file, Perry moved for a new trial. The state district court denied the motion, ruling that because Perry had failed to raise his Brady claims on appeal in the early 1970's, he was barred from raising them now by res judicata. The Montana Supreme Court affirmed. Perry then filed a petition for a writ of habeas corpus in United States District Court. The district court ruled that Perry had demonstrated cause and prejudice stemming from the State's failure to disclose items 3-6 in violation of Brady.[1] The court stated that it would issue the writ if Perry was not afforded a new trial.
 
 II
 
 8
 On appeal, the State argues that Perry's petition should have been dismissed under Rule 9(a) of the Rules Governing Section 2254 Cases. We need not decide what standard of review applies because, even if we review the court's failure to dismiss de novo, we conclude that the State was not entitled to dismissal under Rule 9(a).
 
 
 9
 Rule 9(a) provides that a habeas petition may be dismissed if the State has been prejudiced by petitioner's delay in filing the petition, "unless the petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred." Rule 9(a), 28 U.S.C. foll. § 2254. The advisory committee note states that a delay of more than five years creates a rebuttable presumption that the State has been prejudiced. Once prejudice to the State is established, the burden shifts to the petitioner to show that the petition is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence. Harris v. Pulley, 885 F.2d 1354, 1366 (9th Cir.1988), cert. denied, 493 U.S. 1051 (1990). "The ultimate disposition of whether the petitioner used reasonable diligence is 'based upon the reasonableness of the party's behavior under the circumstances.' " Id. (quoting Baxter v. Estelle, 614 F.2d 1030, 1034 (5th Cir.1980)).
 
 
 10
 Perry's failure to discover and pursue his Brady claims with respect to items 3-6 was not the result of a failure to exercise reasonable diligence. Although attorney Randono knew that the mails were censored, he also knew that the State had told Perry's trial counsel that Stillings had not implicated himself in the murder in any statements beyond those already produced. He knew that the state specifically denied having a letter from Stillings to Mona Brown or having a written statement of Stillings' confession to the Seattle police. It was reasonable for Randono to rely upon the State's representations in the absence of information to the contrary. We hold, therefore, that the district court did not err in refusing to dismiss Perry's petition under Rule 9(a).
 
 III
 
 11
 The State also contends that the district court erred on the merits in granting Perry's petition. We review a district court's decision to grant or deny a habeas petition de novo. Norris v. Risley, 878 F.2d 1178, 1180 (9th Cir.1989). However, we must accept the findings of fact that underlie that decision unless they are clearly erroneous. Id. Perry's 1987 motion for a new trial was denied in state court on the grounds of res judicata. A prisoner who has been procedurally barred by state law from raising a federal constitutional claim cannot obtain habeas relief without demonstrating cause for and prejudice from the default. Wainwright v. Sykes, 433 U.S. 72, 87 (1977).
 
 
 12
 * " '[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.' " Amadeo v. Zant, 486 U.S. 214, 222 (1988) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986). The external impediment may consist of "government interference or the reasonable unavailability of the factual basis for the claim." McCleskey v. Zant, 111 S.Ct. 1454, 1472 (1991). In Perry's case, government interference came in the form of the county attorney's false assurances that the State had voluntarily divulged all Brady material, and in particular that it did not have in its possession any letter from Stillings to Mona Brown. Reasonably relying on the county attorney's representations, Perry's lawyer had no factual basis for pursuing the Brady claim.
 
 
 13
 The State's reliance on McCleskey as controlling authority on the issue of cause is misplaced. In McCleskey, the newly discovered evidence was a 21-page document recounting conversations between McCleskey and a jailhouse informant. See 111 S.Ct. at 1459-60, 1473. The Supreme Court held that McCleskey had not shown cause for failing to raise his constitutional claim--a right to have counsel present during the conversations--for two critical reasons. First, the State had not withheld its evidence, but had surrendered the transcript in question when asked for it. Second, McClesky did not need the transcript to raise his constitutional claim because he could have testified to the substance of his conversations with the jailhouse informant himself, had he not, for tactical reasons, preferred to deny that they ever took place. Id. at 1474. In contrast, the State effectively withheld evidence from Perry by denying its existence in response to his requests. Perry had no independent knowledge that the Stillings letters constituting items 4-6 existed. And although he had seen the Mona Brown letter, his counsel abandoned a Brady theory for obtaining it, not because of a tactical decision not to rely on the letter, but because the prosecutor assured him the State had no such evidence to provide. Thus, McCleskey 's rationale is inapplicable to Perry's Brady claim.
 
 B
 
 14
 To establish prejudice, Perry must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original). The district court held that prejudice existed because "[i]f the defense had been able to impeach Stillings' testimony with copies of the letters, Stillings' credibility would surely have been placed into grave doubt." We agree.
 
 
 15
 The prosecution's entire case against Perry was destined to stand or fall on Stillings' testimony. The physical evidence linking Perry to the murder was marginal. The FBI identified small blood stains on Perry's coat, but was able to identify only one of the stains as human blood. It was also unable to determine the blood type or the age of the stain. The murder weapon was never found. Although there was independent evidence placing Perry in the company of Stillings late on the night of the murder, Stillings was the only witness who placed Perry with the victim on the night of the murder, the only witness who placed Perry at the scene of the murder, the only witness who testified that Vicki Renville's murder occurred late at night, and the only witness who testified that he saw Perry commit the murder.
 
 
 16
 The State does not deny that Stillings' testimony was crucial to its case against Perry. Rather the State argues that its failure to disclose items 3-6 did not prejudice Perry because Stillings was fully impeached on cross-examination with evidence that was available to Perry at trial. In other words, the State argues that items 3-6 would have been cumulative, had they been disclosed before trial.
 
 
 17
 We agree with the State that Stillings was badly impeached. Defense counsel skillfully carried out a strategy designed to persuade the jury that Stillings was merely trying to save his own skin in saying that Perry, not he, murdered the victim after she was raped. Although Stillings had originally confessed that he alone had killed the victim, the State agreed to a plea bargain that allowed Stillings to plead guilty to second degree murder if he testified against Perry. These facts allowed defense counsel to argue to the jury that Stillings was testifying against Perry only to preserve his plea bargain and avoid a first degree murder conviction. But although Stillings was impeached, the jury apparently placed enough stock in his testimony to convict Perry of second degree murder.[2]
 
 
 18
 Had defense counsel had the benefit of Stillings' withheld letters, he would likely have destroyed whatever remaining credibility Stillings had with the jury. Items 4 and 5, in which Stillings undertook to persuade Randy and an unidentified person to corroborate a false alibi, are especially enlightening.
 
 
 19
 First, they express Stillings' clear willingness to lie in order to save his own skin. The evidence available at trial merely allowed counsel to argue that Stillings had a motive for implicating Perry--to keep his plea bargain intact. The letters, which illuminate Stillings' subjective intent, are thus qualitatively superior as impeachment evidence.[3]
 
 
 20
 Second, the letters show Stillings eager to concoct an alibi for a period between 9:00 and 10:30 on the night of the murder. But after scrambling to account for his whereabouts earlier in the evening, Stillings later testified at trial that Renville had been raped and murdered between 11:30 p.m. and 12:30 a.m.--some two hours after the time for which he had been searching for an alibi. The pathologist could not pinpoint when, during the evening, Renville's death had occurred. Significantly, other witnesses had seen Stillings alone with the victim and Perry at home in his trailer during the earlier time frame. Trial trans. at 74-77. Witnesses also saw Stillings and Perry together during the later hour. The jury might reasonably have wondered why, in the weeks following the murder, Stillings had been eager to obscure his activities in the early evening, only to testify, several months later, that Renville had been murdered late at night. They might reasonably have inferred that Stillings lied about the timing of Renville's death in order to be able to blame it on Perry.
 
 
 21
 Finally, the letters cast doubt on Stillings' story because they mention Perry as someone that Stillings knew police detective Tuss suspected of Renville's murder; as someone Stillings told the Seattle police he had visited after accidentally killing Renville; and as someone Stillings could claim his confession was designed to protect, although he also intended to explain his confession by a desire to "get the pigs for [his] false arrest & sue them." Nowhere in these letters does Stillings suggest that Fred Perry actually had a role in Renville's death, or that Perry had been with Stillings that evening until after Renville had been murdered. Perry's role, the jury could infer from the letters, was limited to that of a convenient foil for a man desperate to avoid a life sentence.
 
 
 22
 Items 3 and 6 corroborate this theory. In the letter to Mona Brown, Stillings confesses that Renville's death was an accident for which he would "pay ... for the rest of my life." The letter neither mentions Fred Perry nor suggests that anyone other than Stillings bore any responsibility for Renville's death. In the letter to his brother written two months later, Stillings does write about "protecting someone," but in the context that "on something as big as this rap, [Stillings'] finger is pointing elsewhere than himself."
 
 
 23
 When we consider the importance of Stillings' credibility to the prosecution's case--he was the only witness to testify that Perry was even with the victim on the night of the crime--we feel we must hold that the State's failure to disclose items 3-6 was a constitutional violation that worked to Perry's actual and substantial disadvantage. See Frady, 456 U.S. at 170. The letters express Stillings' willingness to lie to save his own skin, mention Perry as a possible foil, and suggest that Renville was murdered early in the evening, when witnesses placed her alone with Stillings and placed Perry at home in his trailer.
 
 
 24
 AFFIRMED.
 
 
 25
 CYNTHIA HOLCOMB HALL, Circuit Judge, concurring:
 
 
 26
 I cannot concur in Section III(B) of the disposition, which holds that Perry has shown prejudice under United States v. Frady, 456 U.S. 152, 170 (1982). Because I do not believe that the state's procedural bar is based upon an adequate and independent ground of state law, however, I concur in the judgment.
 
 
 27
 The Montana Supreme Court held that Perry was barred by res judicata from pursuing his Brady claim based upon the documents discovered after Stillings's recantation. State v. Perry, 758 P.2d 268, 273-74 (Mont.1988). In order to constitute a barrier to federal habeas review, a state court procedural bar must rest on independent and adequate grounds of state law. Harris v. Reed, 489 U.S. 255, 262 (1989). A state procedural bar is not adequate and independent if it necessarily requires the state court to make an antecedent determination of federal law. Ake v. Oklahoma, 470 U.S. 68, 75 (1985).
 
 
 28
 Here, one element of the Montana res judicata test is that "the issues must be the same, and must relate to the same subject matter." Perry, 758 P.2d at 274. The state court therefore necessarily held that Perry could state only one Brady claim based upon the documents of which he had knowledge at the time of his trial and the documents of which he learned only after Stillings's recantation. In my view, the state court implicitly ruled on the merits of a federal claim by holding that the newly discovered documents did not state a second Brady claim. A state court's bare assertion that the issues and the subject matter of Perry's two Brady claims are "the same" is insufficient to insulate a federal claim from federal review.
 
 
 29
 Because I would hold that the state court's procedural bar is not based on an independent and adequate ground of state law, I concur in the judgment affirming the district court's grant of the writ.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 The district court found that item 1 contained the same substance as item 2, and since Perry had not alleged that item 2 had been withheld, he had not shown prejudice from the withholding of item 1
 
 
 [2]
 The fact that the jury rejected the prosecution's plea for a first degree verdict may reflect a measure of equivocation about Stillings' credibility
 
 
 [3]
 Stillings testified at trial that he intended to use Jim Duvall as an alibi, but Duvall had actually seen Stillings on the night of the murder; the jury heard no evidence that Stillings actually tried to get others to lie on his behalf