No. 87-469

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

STATE OF MONTANA,

       Plantiff and Respondent,

  -vs-

FRED LEE PERRY,

       Defendant and Appellant.

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable John McCarvel, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Bell & Marra; Antonia P. Marra & Barbara E. Bell
argued, Great Falls, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
John Paulson, Asst. Atty. General, Helena
Patrick L Paul, County Attorney, Great Falls, Montana
Stephen Hudspeth, Deputy County Atty., Great Falls

Submitted: May 10, 1988

Decided: June 30, 1988

Filed: JUN 3 0 1988

_Ethel M. Harrison_
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Following trial by jury in the District Court of the Eighth Judicial District, Cascade County, Perry was convicted of second degree murder in connection with the death of 14 year old Vicki Renville in 1971. Perry appealed his judgment of conviction to this Court alleging, inter alia, ineffective assistance of counsel, insufficient corroboration of accomplice testimony, and improper failure to grant a new trial. Justice John C. Harrison wrote the opinion which affirmed the conviction. See State v. Perry (1973), 161 Mont. 155, 505 P.2d 113.

On April 21, 1987, Perry moved for an indigency determination, appointment of counsel, and a new trial or other appropriate relief based on the alleged recantation of his accomplice, Michael Stillings. Perry later argued that the State had also failed to provide his counsel with exculpatory evidence during the initial trial. Following a hearing on the matter, the District Court of the Eighth Judicial District, Cascade County, entered findings of fact, conclusions of law and an order denying relief. Perry appeals from the District Court's judgment. We affirm.

The issues before this Court are:

1. Is the failure to provide Perry with exculpatory evidence res judicata?

2. Did the District Court correctly determine that Stillings' 1971 trial testimony was presumed truthful?

3. Did the District Court accord Perry a full and fair hearing?

FACTS

The body of Vicki Renville was discovered by a motorcyclist on a county road near Great Falls on February 24, 1971. Following an autopsy, Dr. Jack Henneford, the pathologist who examined the body, determined that Vicki Renville had died from multiple blows to the left side of the head, resulting in fractures of the skull and extensive bleeding within the cranial cavity. Dr. Henneford also ascertained two recent disruptions of the hymen; that Renville had been dead at least eight hours when discovered; and that she had lived an hour or more after the blows had been inflicted. He testified that the fatal injury could have been inflicted by a tire iron and that she had several wounds on her hands consistent with her possible attempt to block the blows.

When initially interviewed about his whereabouts on the night of the murder, Perry stated he had been at home all evening, watching television and had later gone to bed. However, he subsequently contacted the Cascade County Sheriff's Office from the Missoula County jail and indicated he had information concerning the death of Renville. Following his transfer to the Cascade County Jail, he informed Cascade County law enforcement officials that Michael Stillings might be responsible for the death.

Stillings was subsequently apprehended in Seattle, Washington. When questioned about the Renville murder by Cascade County Deputies, Stillings gave a confession in which he stated that he had accidentally struck the victim with a stick when Renville startled him. Stillings also indicated that he was under the influence of drugs at the time of the murder and was attempting to retrieve some cached drugs when Renville came upon him. The Stillings confession was used in support of leave to file an information against him.

Following his transportation to Great Falls, Stillings was placed in the Cascade County Jail. While incarcerated, Cascade County jailers intercepted four notes from Stillings to family and friends. The notes indicated that the death was an accident and requested that various people help him establish an alibi. However, the final letter, in essence, indicated that Stillings was not willing to keep quiet and take the fall for someone else "this time." Shortly thereafter, Stillings informed law enforcement officials that Perry had murdered Renville with a tire iron after both men had raped her.

At the initial trial of Perry, Stillings testified that he first encountered Renville at 9:00 p.m. on February 23, 1971. Following a brief conversation, Stillings and Renville went "cruising up and down the drag," and then to the Great Northern train depot where he bought two hits of LSD. At approximately 10:00 p.m., Renville was dropped off at Sandy's Drive-In. The testimony of Chris Shatto confirms that Renville was alive and with Stillings at this time.

Stillings then picked up Dick Maxwell and proceeded to Perry's residence, where a number of people were watching a movie entitled "The Eye of the Cat." Renville was not with them.

Following the movie, Perry, Stillings, Chris Shatto and Joanne Kimbell motored to a house located on the north side of Great Falls, where Shatto and Kimbell were dropped off. Perry and Stillings then headed toward down-town Great Falls.

Stillings testified that he and Perry observed Renville walking about a block from Sandy's Drive-In. Following their offer of a ride, Renville entered the car with Perry and Stillings. The group then proceeded to an area known as Wadsworth Park.

Upon reaching Wadsworth Park, Stillings informed Renville that he wanted to have intercourse. When Renville refused, Stillings testifed that he placed a knife against her throat and said "or else." Both Stillings and Perry raped Renville. Following the attacks, Renville exited the car. When she threatened to "rat," Stillings witnessed Perry strike her on the head repeatedly with a tire iron. Perry and Stillings then fled the scene. Shortly thereafter (12:30 a.m.), they picked up Mike Baldwin and Jim Duvall in an attempt to establish an alibi. Stillings later changed his car tires and disposed of the tire iron.

The State at trial also presented evidence that the coat worn by Perry on the night of the murder was spotted with human blood. In addition, JoAnn Wittke testified that Perry had informed her that a big guy and a small guy had killed Renville and then had thrown some car tires in the river. Perry and Stillings could be described as a big guy and a small guy.

Although his counsel vigorously cross-examined Stillings concerning his confession, Perry did not take the stand during the 1971 trial, nor did he present evidence in support of his alibi defense. However, Perry had earlier given a statement to the officers in which he indicated that he was at home all evening and went to bed at midnight. He later gave a sworn statement, in the presence of counsel, in which he stated he was with Stillings and Renville just prior to the murder but had been dropped off at Debbie Phillip's house. Pursuant to this version of the night in question, Perry was alleged to have been making love during the time of the murder. He was then picked up by Stillings while walking home. They encountered Mike Baldwin and Jim Duvall shortly thereafter.

Neither Debbie Phillips nor her mother confirmed Perry's story nor testified at trial. They did, however, before Perry's trial, give sworn statements which apparently contradicted Perry's story. When informed of this state of affairs, and the fact that his counsel had a copy of the statements, Perry, surprised, responded "what?" Due to the passage of time, the original sworn statements by Debbie Phillips and her mother could not be found. However, Perry and his counsel acknowledged that the second explanation of the night of the murder was a fabrication.

Perry was subsequently convicted of second degree murder. He then moved for, and received, the appointment of new counsel immediately following the conviction.

Replacement counsel, Mr. Randono, thereafter moved for a new trial, alleging, inter alia, that the State failed to provide, pursuant to a discovery motion, the defense with exculpatory evidence, specifically, Stillings' Seattle confession and a letter from Stillings to Mona Brown which indicates the death was accidental. The motion was subsequently denied and the issue of exculpatory evidence was not raised on the initial appeal. The record is generally unclear as to which documents Perry received pursuant to the motion. However, Perry's trial counsel stipulated that the State had complied with the discovery request the day of trial and Stillings was cross-examined on the basis of his confession. In addition, Perry did not call his former attorneys to the witness stand during the 1987 hearing.

For a period of 15 years, Stillings was content to abide by his trial testimony. However, in 1986, Stillings learned that he and Perry would be incarcerated in the same prison for the first time. Shortly after Perry arrived, Stillings determined that his new found faith demanded that he come forward with the truth in order to relieve his conscience.

Stillings contacted Perry through an intermediary and gave a sworn statement recanting his trial testimony shortly thereafter. Although Stillings indicated he originally confessed out of fear for his safety, he contends that his recantation was not motivated by similar concerns.

Following Stillings' recantation, Perry immediately filed a motion for an indigency determination, appointment of counsel, and a new trial or other appropriate relief. However, he did not raise the issue of the State's failure to provide exculpatory documents in his pleading nor was the pleading ever amended to include such a claim. Counsel indicates that the exculpatory documents were not discovered until shortly before the hearing.

Stillings' recantation testimony is that he encountered Renville between 6:00 and 9:00 p.m. as she was walking to a store. Shortly thereafter, she and Stillings drove to the train depot where they parked and talked to some friends. Stillings then drove to Wadsworth Park with the avowed purpose of raping Renville.

Upon reaching the desired location, Stillings claims that he displayed a knife and told Renville to get undressed. Following the rape, both parties dressed and exited the car. Stillings testified that he then struck Renville with a tire iron and fled the scene. He went to Perry's residence immediately thereafter in order to establish an alibi. However Stillings' recantation conflicts with the testimony of Chris Shatto. She testified that she saw Renville and Stillings together after the time Stillings had allegedly killed her. In addition, the recantation also conflicts with Perry's second version of the murder.

Perry also took the stand. Under this version of the night in question, he remained at his home all evening except for 30-45 minutes sometime between 11:00 p.m. and midnight.

- 7 -

At that time, he and Stillings had given Chris Shatto and Joann Kimbell a ride to another residence. Perry then returned home and worked on a .30 caliber machine gun until 3:00 or 4:00 a.m.

Although additional witnesses testified or submitted affidavits, the last major witness was Rande Branden, a long time friend of Stillings who is currently incarcerated with Stillings on an unrelated homicide conviction. Branden testified that he had encountered Stillings three times on the evening in question. One occasion, Branden said, was when Stillings appeared at his home, at approximately 7:30 p.m., in a dazed and confused mental state. At that time, Stillings rambled incoherently, but Branden was able to decipher the word "dead" at least twice. Stillings then removed his pants for no apparent reason and was given another pair of pants by Branden.

Approximately two days later, Branden claims he surmised that Stillings may have committed the Renville murder. Upon examining Stillings' pants, he observed dark spots he suspected to be blood. He then cut the pants into pieces and flushed them down a toilet. Stillings has never indicated that he had contact with Branden on the night of the murder. Stillings did testify, however, that he had washed his own clothes and a letter was introduced into evidence in which Stillings asked Branden to testify that he had been with Stillings. The District Court labelled the testimony "incredible."

PROCEDURE

The State initially argues that although denoted a motion for new trial or other appropriate relief, Perry's pleading is a petition for post-conviction relief. Consequently, Perry's claims would be barred pursuant to the five year statute of limitations imposed by § 46-21-102, MCA.

However, upon examination of Perry's motion, we find that Perry alleges, in essence, that he is being unlawfully detained in violation of his constitutional rights, put bluntly, that the State of Montana has unjustly incarcerated an innocent man for a period of 17 years on the basis of a flawed conviction.

Although Perry could not have brought his claim until the recantation occurred in 1986, the State would have us find that Perry's only means of redress is a petition for post-conviction review and that the statutory clock on such petitions ran in 1978. We decline to do so. Under the interpretation urged by the State, a defendant held in violation of his constitutional rights would be deprived of a method of redress regardless of his diligence or the justness of his claim. We do not believe such a result to be the intent of the legislature nor consistent with our State Constitution. See 1972 Montana Constitution, Art. II, § 17.

The central function of the courts is the achievement of justice. However, like all endeavors of man, the search for justice is not without occasional flaws. From the time of the Magna Charta, the Great Writ of Habeas Corpus has been liberally employed as a means of guaranteeing that this judicial goal be accomplished and that a miscarriage of justice will be remedied. See 3 Blackstone Comm. at 129 et. seq. For at its heart, the writ represents an acknowledgement of the principle that the rights of freedom of the individual are worthy of protection.

Whereas Perry's motion for a new trial cannot technically be denoted a petition for habeas corpus, nor do we treat it as such, the claim nevertheless sounds in the nature a petition for habeas corpus. We determine that in this case, the single issue is whether Perry is entitled to a

new trial based on the proffered evidence of another person doing the criminal act for which Perry was convicted.

The burden of proof in such cases is stringent. In order to receive a new trial Perry must demonstrate that he has been the victim of an unjust conviction which has resulted in his unlawful detention. We conclude that he has failed to do so.

## EXCULPATORY EVIDENCE

The first specification of error concerns the State's alleged failure to provide Perry with exculpatory evidence in violation of his right to due process of law, as guaranteed by the Fourteenth Amendment, and his Fifth Amendment right to a fair trial. More precisely, that the mandate of Brady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 and State v. Craig (1976), 169 Mont. 150, 545 P.2d 649, demands that a new trial be granted because the State's negligent failure to provide Perry with the letters and confession of Michael Stillings was of such a material and substantial nature as to have changed the verdict of the jury. However, the District Court found the issue to be res judicata. We agree.

While the mandate of due process and Art. II, § 16 of the Montana Constitution guarantees every person access to the courts, it cannot be said that such rights grant a person license to relitigate a cause or to burden the resources of the court with successive claims which could have been brought in one action. As one court has stated: "judicial economy dictates restrictions on reruns." Coleman v. State (Mont. 1981), 633 P.2d 624, 630, 38 St.Rep. 1352, 1359, cert.den. 455 U.S. 983, 106 S.Ct. 983, 71 L.Ed.2d 693, citing United States ex rel. Townsend v. Twomey (7th Cir. 1971), 452 F.2d 350, 357, cert.den. 409 U.S. 854, 93 S.Ct. 190, 34 L.Ed.2d 98.

Similarly, the public interest in finality of judgments also weighs heavily against serial litigation. See Murray v. Carrier (1986), 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397. The doctrine of res judicata is an embodiment of both principles. See Wellman v. Wellman (1982), 198 Mont. 42, 643 P.2d 573. It stands for the proposition that there must be an end to litigation at some point. First Bank v. Fourth Judicial Dist. (Mont. 1987), 737 P.2d 1132, 1134, 44 St.Rep. 861, 864. Consequently, once a party has had full opportunity to present a claim or issue for judicial decision in a given proceeding, the judgment of that court will be deemed final as to all claims or issues which have been raised or which fairly could have been raised. Wellman, 198 Mont. at 45-46, 643 Mont. at 575.

In Taggard v. Rutledge (D. Mont. 1987), 657 F.Supp. 1420, the Court examined the nature, as well as this Court's treatment, of the doctrine of res judicata. It stated:

> Res judicata principles embody two concepts. 'Issue preclusion' refers to the preclusive effect of a judgment in foreclosing litigation of a matter that has been litigated and decided. [Cite omitted.] In contrast, 'claim preclusion' refers to the preclusive effect of a judgment in foreclosing litigation of matters that should have been raised in an earlier suit. . . .
>
> The Montana Court has recognized the distinction between claim preclusion and issue preclusion, though not always articulating the precise definitions thereof. [Cite omitted.] When directly confronted with the issue, however, the Court clearly has followed the general rule governing claim preclusion. As early as 1935, the Court has recognized that a judgment is "binding and conclusive between the parties to the suit and their privies and successors in interest, as to all matters adjudicated therein and as to all issues which could have been properly raised, irrespective, of whether the particular matter was in fact litigated." [Citation omitted.]

657 F.Supp. at 1428, 1430.

In the instant case, Perry does not contend that the prosecuting attorney purposely suppressed exculpatory evidence. Rather, the alleged suppression is said to have been the result of good faith negligence. Unfortunately, the record is generally silent as to which documents Perry did or did not receive from the State as neither the prosecuting attorney nor any of Perry's three attorneys from 1971 testified. However, the record does disclose that Perry's trial counsel informed the court that the State had complied with Perry's discovery request; that Stillings was cross-examined concerning his earlier confession; and that replacement counsel Randono moved for a new trial on the basis of the State's failure to provide Perry with Stillings' Seattle confession and the letter from Stillings to Mona Brown, but failed to raise the claim during the 1973 appeal. The State contends that Perry's failure to raise the exculpatory evidence claim on the initial appeal following the District Court's denial of the motion for new trial is sufficient to invoke the claim preclusion facet of res judicata. Upon examination, we find the State to be correct.

In order for res judicata to bar reconsideration of a claim, four elements must be present:

> (1) the parties or their privies must be the same; (2) the subject matter of the action must be the same; (3) the issues must be the same, and must relate to the same subject matter; and (4) the capacities of the persons must be the same in reference to the subject matter and to the issues between them. [Citation omitted.]

Coleman, 633 P.2d at 630, 38 St.Rep. at 1358.

Although Perry argues that the "new" discovery of the existence of exculpatory evidence precludes satisfaction of the second, third, and fourth elements of the Coleman test,

- 12 -

we do not find the allegedly "new" evidence to be controlling. The fact remains that the claim pits the same plaintiff and defendant against each other on the basis of a claim that Perry is entitled to a new trial because the State failed to provide exculpatory evidence, part of which was listed in the 1971 motion. While Perry may not have been aware of all the documents at that time, he was unquestionably aware of the existence of two documents and could have raised the claim on his initial appeal. The Coleman test is clearly satisfied.

## THE RECANTATION

The second specification of error concerns the District Court's failure to grant a new trial on the basis of Stillings' recantation. Perry does not attack the District Court's factual findings that Stillings was not credible; that Stillings' recantation could not be true because it conflicted with the testimony of other witnesses; that Stillings recanted out of fear for his life; that Perry lied on the stand; or that the testimony of Rande Branden is incredible. Rather, he contends that the District Court improperly applied the presumption of truthfulness to Stillings' 1971 testimony but not the subsequent recantation. As a result, Perry claims he was forced to shoulder the undue burden of proving the 1971 testimony was false.

The District Court's reference to the presumption of truthfulness surrounding Stillings' 1971 testimony, in effect, adopts the prevailing judicial attitude that recanted testimony is to be viewed with great suspicion. State v. Tharp (Iowa 1985), 372 N.W.2d 280; State v. Norman (Kan. 1982), 652 P.2d 683; In Re Weber (Cal. 1974), 523 P.2d 229; Thacker v. Commonwealth (Ky. 1970), 453 S.W.2d 566; People v. Nash (Ill. 1967), 222 N.E.2d 473; State v. Wise (Ariz. 1966), 419 P.2d 342. We believe the rule to be well reasoned.

- 13 -

On its face, recanted testimony demonstrates the unreliability of a witness. In addition, it also raises other inquires: what motive would cause a person to subject himself to a potential perjury prosecution? In many cases, the answer is fear. See e.g., State v. Sena (N.M. 1987), 736 P.2d 491 (defendant's family intimidated recanting witness with threats and acts of physical violence). Perry argues, however, that Stillings' recanted testimony is also entitled to a presumption of truthfulness and that the recantation per se mandates a new trial. Accord, State v. York (Wash. App. 1985), 704 P.2d 1252. However, to grant a person of questionable credibility and motive carte blanche to overturn the determination of a jury operating within the bounds of our constitutional protections is not conducive to the sound administration of justice. People v. Shilitano (N.Y. App. 1916), 112 N.E 733; Accord, State v. Miller (Mont. 1988), ___ P.2d ___, 45 St.Rep. 790; State v. Greeno (1959), 135 Mont. 580, 342 P.2d 1052.

In light of the inherent suspicion surrounding recanted testimony and the public interest in swift and sure justice, we believe the better reasoned approach to be that adopted by the Supreme Court of Kansas:

> When a new trial is sought on the basis of recanting testimony of a prosecution witness, the weight to be given such testimony is for the trial judge passing on the motion for a new trial to determine. [Citations omitted.] The trial judge is required to grant a new trial only when he [or she] is satisfied the recantation of the witness is true.

Norman, 652 P.2d at 689; see also, Thacker, 453 S.W.2d at 568; Nash, 222 N.E.2d at 478. We accordingly adopt the same. Absent a clear abuse of discretion, the decision of the District Court will be upheld.

In the instant case, Stillings' recantation appears to be newly discovered perjury, not newly discovered evidence. As the District Court noted, the current versions of the night in question do not conform to the testimony of the other witnesses; the evidence presented at trial; Perry's prior statements; nor does it account for Perry's whereabouts at the time of the murder. It does strain the imagination, however. We conclude that Perry has failed to demonstrate the 1971 testimony was false.

## ADEQUACY OF THE PROCEEDING

Finally, it is argued that the court improperly relied on affidavits submitted after the hearing in violation of Rule 59, M.R.Civ.P.; refused to accept the proffered affidavits of two witnesses; and improperly relied on Perry's unsigned statements. We disagree.

Rule 59(c), M.R.Civ.P. provides that the party opposing a motion for new trial has ten days in which to file affidavits. However, Perry's pleading cannot be denoted a motion for new trial within the meaning of Rule 59 as the ten day filing deadline expired in 1971. See 59(b), M.R.Civ.P. Rather, the pleading sounds of a petition for habeas corpus. The crucial question is therefore whether the fact finding procedure employed by the District Court was adequate to afford Perry a full and fair hearing. See, Townsend v. Sain (1963), 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770; Little Light v. Crist (9th Cir. 1981), 649 F.2d 682.

Perry's allegation that the District Court's acceptance of two affidavits immediately following the hearing is reversible error is not convincing. The record discloses that Perry was provided two highly capable and diligent attorneys; that he was provided the services of a court reporter to take depositions at no expense; that he was provided adequate notice; that he was allowed to confront and

- 15 -

cross-examine witnesses; that he presented witnesses in his behalf; that he was personally present and took the witness stand; and that exhibits offered on his behalf were admitted into evidence. In addition, Perry did not request a continuance nor did he submit additional evidence following notice of the affidavits. Perry clearly had a full and fair hearing.

Similarly, Perry's contention that the District Court improperly refused to accept the affidavits of two witnesses is equally without merit. A review of the record indicates that the court did not refuse to accept the affidavits of Shatto and Kimbell. Rather, the court offered to accept counsel's offer of proof in lieu of the affidavits. Perry's decision not to submit the affidavits will not now be heard to constitute error.

Finally, it is contended that the court's acceptance of Perry's sworn statement from 1971 was error because the statement was not signed by him as required by Rule 30(e), M.R.Civ.P. However, we note that district courts are not strictly bound by all the rules of civil procedure in this type of proceeding. See generally, Coleman, supra (although post-conviction review is civil in nature, not all civil procedures are applicable); In Re Hart (1978), 178 Mont. 235, 583 P.2d 411 (habeas corpus may be either civil or criminal in nature); Schlanger v. Seamans (1971), 401 U.S. 487, 91 S.Ct. 995, 28 L.Ed.2d 251 (although habeas corpus is generally a civil action, it is not automatically subject to all the rules governing civil actions); Harris v. Nelson (1969), 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (characterization of habeas corpus proceeding as "civil" is gross and inexact, the proceeding is essentially unique). The crucial question is again whether the procedure employed by the District Court comports with Perry's right to a full

and fair hearing.  See, <u>Townsend</u>, supra; <u>Little</u> <u>Light</u>, supra. We find that it did.

In the instant case, Perry contended that Stillings' recantation, in conjunction with his latest version of the night in question, demonstrated that the State of Montana was unlawfully detaining him on the basis of an unjust verdict. Under such circumstances, it is clearly relevant, and fair, for the District Court to examine Perry's prior explanation of the night of the murder.  Particularly, when such statements were originally obtained in the presence of Perry's counsel and Perry had an opportunity to explain the statements at the 1987 hearing.

In light of our discussion above, it is clear that Perry has failed to demonstrate that he is being unlawfully detained.  The judgment of the District Court is affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices