No. 97-022

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

STATE OF MONTANA,

Plaintiff and Respondent,

v.

RICHARD DARRELL LINDEMAN,

Defendant and Appellant.

APPEAL FROM:   District Court of the Twentieth Judicial District,
In and for the County of Sanders,
The Honorable C. B. McNeil, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

John E. Smith, Missoula, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, Patricia J. Jordan, Assistant
Attorney          General, Helena, Montana; Bob Slomski, Sanders County Attorney,
Thompson Falls, Montana

Submitted on Briefs: June 5, 1997

Decided:   November 4, 1997
Filed:

_____
Clerk

Justice William E. Hunt delivered the Opinion of the Court.

This is an appeal from the Twentieth Judicial District Court, Sanders County. On September 25, 1996, the District Court entered judgment revoking Defendant Lindeman's suspended sentence and imposing the full sentence of four concurrent ten-year terms in the Montana State Prison. From this judgment Defendant Lindeman appeals. We affirm in part, reverse in part, and remand.

We frame the issues raised on appeal as follows:

1. Was the District Court's order modifying Lindeman's condition of probation res judicata on its subsequent order revoking Lindeman's suspended sentence?

2. Did the District Court abuse its discretion when it revoked Lindeman's suspended sentence?

3. Did the District Court err in reserving its determination of Lindeman's parole eligibility?

BACKGROUND

In September 1989, Richard Darrell Lindeman (Lindeman) was arrested and charged with two counts of felony sexual assault and two counts of felony incest of his two minor stepdaughters. On October 10, 1989, Lindeman pleaded guilty, and on December 19, 1989, the District Court sentenced him to four concurrent ten-year sentences. All but 30 days were suspended, provided Lindeman abided by certain terms and conditions of probation. Among those terms, Lindeman was prohibited from having unsupervised contact with minors and was required to complete an approved sex offender treatment program.

Lindeman began treatment in an approved program known as SABER (Sexual Abusive Behavior Evaluation and Recovery), which was run by Dr. Michael Scolatti in Missoula, Montana. Lindeman attended the weekly therapy sessions for about one and a half years.

In March 1991, Dr. Scolatti terminated Lindeman from the program, because Lindeman, who was approximately 40, had become sexually involved with a woman who was about 20 years his junior. The program had a rule that those undergoing treatment were not allowed to have a sexual relationship with anyone whose age differed by more than 5 years. Even though the woman was of legal age, Dr. Scolatti considered a sexual relationship to perpetuate the cycle of abuse. Dr. Scolatti testified that Lindeman had originally assured him that the relationship was platonic, but when the woman became pregnant, it was evident Lindeman had been lying. Dr. Scolatti refused to continue working with him. He did, however, recommend another treatment program run by Andy Hudak, called the Northwest Family Recovery Program.

Lindeman eventually married the young woman, and they had a daughter. Instead of entering the treatment program recommended by Dr. Scolatti, he began counseling sessions in April 1991 with Dr. Jack Oakwright in Sandpoint, Idaho. Lindeman's probation officer at that time was aware of those sessions.

Subsequently, Lindeman received a new probation officer, who also knew that Lindeman was receiving treatment from Dr. Oakwright.  At no time did that second probation officer disapprove of the treatment.  On January 6, 1992, Dr. Oakwright wrote the probation officer a letter stating that Lindeman had þgraduated,þ although Lindemanþs wife and he were continuing with additional counseling sessions.  The probation officer does not recall ever telling Lindeman that he had successfully completed the required sex offender treatment program.  It was his opinion that because Lindeman was still receiving some counseling, he was still in the treatment mode.  Additionally, the probation officer testified that at some point he had expected to receive a copy of an official graduation letter from Dr. Oakwright confirming that Lindeman had indeed successfully completed sex offender treatment.  The written confirmation was never received.

In July 1992, Lindeman and his wife moved to Great Falls, Montana, and he again received a new probation officer.  This third probation officer insisted that Lindeman either move out of his home or make arrangements for his daughter to live elsewhere.  Lindemanþs wife was attending school, and the probation officer was concerned that Lindeman would be spending significant time alone with his daughter, in violation of the condition of probation that he not have unsupervised contact with minors.  Additionally, this probation officer reviewed Lindemanþs file and saw no evidence that Lindeman had completed any sex offender treatment program.  He noticed that Lindeman had attended a few brief sessions with Dr. Oakwright, whom he contacted.  Dr. Oakwright informed him that Lindeman had not completed treatment and recommended that Lindeman continue couples therapy with someone who was knowledgeable of sex offender issues.  In Dr. Oakwrightþs opinion, Lindeman had a þsignificant sexual addiction which . . . survived throughout his treatment.þ

Accordingly, Lindeman was referred to Ron Silvers at the Montana Sex Offenders Treatment Association.  Silvers met with Lindeman in April 1993.  After an evaluation, Silvers found he was not amenable to outpatient treatment.  He testified that Lindeman had a poor attitude and refused to sign medical releases to enable him to obtain records from Dr. Scolatti.  He also found Lindemanþs behavior to be alarming.  Lindeman denied that he had a problem and did not want treatment.  He sought an evaluation only because he wanted Silvers to certify that he posed no risk to his daughter or other minor children.  Silvers refused to accept Lindeman into treatment.

Lindeman did not enter any treatment program and did not move out of his home to protect his daughter.  Instead, in May 1993, just ten months after moving to Great Falls, he moved to Plains, Montana.  His earlier second probation officer became his probation officer once again.

On August 19, 1993, Lindeman requested the District Court to modify his rules of probation to allow him unsupervised contact with minors.  He represented to the District Court that he had successfully completed the required sex offender treatment program.  Additionally, he had passed a polygraph examination with questions formulated to reveal any sex crimes committed since his conviction, any inappropriate contact with his daughter, or any thought processes common among offenders towards his infant daughter.  At this point, his current probation officer apparently believed that Lindeman had successfully completed a sex offender treatment program and concurred with Lindemanþs request with one change. He requested that Lindeman be allowed unsupervised contact only with his two-year old daughter rather than all minors.  On September 23, 1993, the District Court modified the condition to allow Lindeman unsupervised contact with his daughter.  It further ordered that Lindeman be subjected to routine polygraph examinations.  In all other respects, the original terms of the probation remained unchanged.

In August 1993, Lindeman moved again, this time to Kila, Montana.  Once there, two or three probation officers were assigned to his case for various time periods.  In October, 1995, he received his latest probation officer, who reviewed his file.  She found no evidence that Lindeman had completed the required sex offender treatment program.

That probation officer also discovered that although Dr. Oakwright had provided Lindeman with some treatment, Dr. Oakwright was not certified to provide sex offender counseling as required by the terms of the probation.  He was not a member of the National Association for Treatment of Sexual Abusers, the Montana Sex Offenders Treatment Association, or any other equivalent state program.  Indeed, Dr. Oakwright admitted to the probation officer that he was not qualified to provide sex offender treatment services.

Additionally,  the counseling Dr. Oakwright provided did not meet the standards of the state and national organizations.  Lindeman  had attended only ten one-hour sessions, and those were frequently accompanied by his wife.  Lindeman had attended one or two additional treatment sessions.  He attended no group therapy sessions.

The probation officer further discovered that Lindeman had not completed the treatment that even Dr. Oakwright had suggested.  With regard to the 1992 letter stating that Lindeman had þgraduated,þ Dr. Oakwright explained that Lindeman had only completed an þeducational treatment programþ and nothing more.  Lindeman had quit counseling without  giving Dr. Oakwright any notice.  It remained Dr. Oakwrightþs opinion that Lindeman required further counseling.

Thus, on January 3, 1996, the probation officer held an intervention hearing to give Lindeman another chance to comply with the conditions of his probation.  As a result of that hearing Lindeman was ordered to enter and successfully complete an approved sex offender treatment program.  He was further ordered to contact an approved therapist by January 15, 1996.  He once again was referred to Andy Hudak of the Northwest Family Recovery Program.

Lindeman contacted Hudak by January 15, as required.  Hudak sent him an evaluation packet to complete and return.  Hudak had agreed to allow Lindeman to pay

a reduced fee of $150.00. Moreover, Hudak gave him several months, until April 1, 1996, to pay. In spite of this, Lindeman failed to complete and return the packet, and he failed to pay the fee. Hudak testified that if money was a problem, he would have worked out a solution with Lindeman. However, Lindeman never communicated to him that money was an issue, and Lindeman showed no motivation for treatment. By letter dated May 13, 1996, Hudak notified his probation officer that Lindeman had failed to follow through on the screening process for entering the treatment program.

On May 23, 1996, the State filed a petition to revoke Lindemanþs suspended sentence. On September 25, 1996, the District Court entered judgment finding that Lindeman had violated the condition of his suspended sentence by failing to complete sex offender treatment with a certified specialist approved by the probation office. It therefore revoked the suspended sentence and imposed the full four ten-year concurrent sentences at the Montana State Prison without eligibility for parole until he successfully completed the sex offender treatment program. On November 12, 1996, the District Court denied Lindemanþs motion to reconsider. Lindeman now appeals.

ISSUE ONE

Was the District Courtþs order modifying Lindemanþs condition of probation res judicata on its subsequent order revoking Lindemanþs suspended sentence?

On September 23, 1993, the District Court entered an order modifying the terms of Lindemanþs probation to allow him unsupervised contact with his minor daughter. In so doing, it stated that Lindeman had completed a sex offender treatment program. Specifically, the order provided:

The Court finding that the Defendant has successfully completed the sex offender treatment program, and thereafter passed a polygraph examination administered by Richard Stotts, and there being no objection from the State of Montana;

IT IS HEREBY ORDERED that Defendantþs condition of probation No. 3 contained in the Judgment of this Court, dated December 15, 1989, is stricken; and substituted in its place is the following condition:

The Defendant may have unsupervised contact with his minor child. The Defendant will be subject to polygraph examination at the request of his probation officer. If the polygraph examination results show any deception by Defendant regarding inappropriate conduct with minors, the Defendant shall not have any further unsupervised contact with his minor child and shall be subject to a revocation proceeding before this Court.

In all other respects, the Judgment of this Court, dated December 15, 1989 shall remain unchanged.

(Emphasis added.)

Lindeman argues that the foregoing constitutes a conclusive finding that he had completed the required sex offender treatment program, and that the order actually

removed that condition of probation. He contends that in the subsequent revocation proceeding, the District Court was bound by this "finding." According to his line of reasoning, the doctrine of res judicata prohibited the District Court from revoking his suspended sentence on the basis that he had failed to complete the treatment program.

"[R]es judicata is a final judgment which, when rendered on the merits, is an absolute bar to a subsequent action between the same parties or those in privity with them, upon the same claim or demand." Scott v. Scott (Mont. 1997), 939 P.2d 998, 1001, 54 St.Rep. 548, 550 (citing Fiscus v. Beartooth Electric Cooperative, Inc. (1979), 180 Mont. 434, 436, 591 P.2d 196, 197). It prevents a party from re-litigating a matter that the party has already had the opportunity to litigate. Hollister v. Forsythe (1996), 277 Mont. 23, 27, 918 P.2d 665, 667 (citing Loney v. Milodragovich, Dale & Dye, P.C. (1995), 273 Mont. 506, 510, 905 P.2d 158, 161). A claim is res judicata when four criteria are met: (1) the parties or their privies are the same; (2) the subject matter of the claim is the same; (3) the issues are the same and relate to the same subject matter; and (4) the capacities of the persons are the same in reference to the subject matter and the issues. Hollister, 918 P.2d at 667 (citing Loney, 905 P.2d at 161).

In this case, the issues in the two matters differed. The sole issue raised, litigated, and decided in the motion to modify the conditions of Lindeman's suspended sentence was whether his third condition of probation should be altered to allow him unsupervised contact with minors. Whether or not he had completed a sex offender treatment program, in compliance with the second condition, was not before the court. Lindeman did not request the District Court to remove that condition, and the parties did not litigate whether that condition had been satisfied. The District Court heard no testimony regarding whether Lindeman ever completed treatment or whether Dr. Oakwright was a certified sex offender treatment specialist.

The District Court's sole decision was to allow Lindeman unsupervised contact with his minor daughter so long as he passed polygraph examinations on the issue of his sexual conduct towards minors. The court did not remove the condition that he complete treatment. Indeed, it specifically held in the last sentence of its order that all other conditions of probation remained unchanged.

Although the District Court mistakenly stated that Lindeman had completed treatment, and Lindeman's misrepresentations to the court in this regard must have carried influence, such a "finding" was not necessary to the court's decision. Rather, the District Court had the authority to modify the condition to allow him unsupervised contact with his daughter "at any time" upon notice to the probation officer. Section 46-23-

1011(4), MCA. In this case the District Court was apparently confident that a polygraph examination would adequately monitor Lindeman. In short, the District Courtþs statement that he had completed treatment does not constitute a conclusive, litigated finding.

Lindeman cites State v. Black (1990), 245 Mont. 39, 798 P.2d 530 and State v. Perry (1988), 232 Mont. 455, 758 P.2d 268 in support of his argument. Both are distinguishable. In Black, this Court held that the issue of whether the defendant had been denied ineffective assistance of counsel was barred by the doctrines of res judicata and law of the case, because the District Court had already rendered a decision on that issue which we reviewed and affirmed. Black, 798 P.2d at 533. In Black, unlike this case, an evidentiary hearing had been held before the District Court, and the issue was fully litigated. Black, 798 P.2d at 533.

In Perry, the defendant had argued that he was entitled to a new trial because the State had failed to provide him with exculpatory evidence. This Court held that the issue was res judicata because the defendant could have, but failed, to raise the issue on his initial appeal. Perry, 758 P.2d at 274. Unlike Perry, the issue as to whether or not Lindemanþs sentence should be revoked for failing to complete a treatment program could not have been decided by the District Court when ruling on the earlier motion. Whether or not to modify the conditions of Lindemanþs probation was before the District Court solely by way of Lindemanþs motion, and the only issue Lindeman presented was whether he should be allowed unsupervised contact with minors. The only method by which the Sate could have challenged whether Lindeman had violated the condition of probation and request that his sentence be revoked was by filing a separate petition pursuant to õ 46-18-203, MCA. In such a case, the defendant is entitled to a hearing, with two exceptions not relevant here. Section 46-18-203(5), MCA. The State could not have tacked those issues on to Lindemanþs earlier motion, which did not even require a full hearing under õ 46-23-1011(4), MCA.

The State did subsequently file such a petition to revoke and the matter went to a hearing. The issue as to whether Lindeman had completed the treatment program was then litigated and decided for the first time. We hold that the prior order modifying Lindemanþs condition of probation was not res judicata on the District Courtþs subsequent order revoking his suspended sentence.

ISSUE TWO

Did the District Court abuse its discretion when it revoked Lindemanþs suspended sentence?

It is within the District Courtþs discretionary power to revoke a suspended sentence when a defendant has violated the terms and conditions of his suspended sentence. Section 46-18-203(7), MCA, provides:

If the court finds that the defendant has violated the terms and conditions of the suspended or deferred sentence, the court may:

. . . .

(c) revoke the suspension of sentence and require the defendant to serve either the sentence imposed or any lesser sentence;

Section 46-23-1013(2), MCA, similarly provides :

If the violation [of a condition of probation] is established, the court may continue to revoke the probation or suspension of sentence and may require him to serve the sentence imposed or any lesser sentence and, if imposition of sentence was suspended, may impose any sentence which might originally have been imposed.

The standard for revoking a suspended sentence requires that the District Court be reasonably satisfied that the conduct of the probationer has not been what he agreed it would be if he were given liberty. State v. Butler (1995), 272 Mont. 286, 289, 900 P.2d 908, 910 (citing State v. Lundquist (1992), 251 Mont. 329, 331, 825 P.2d 204, 206.) A violation of the terms and conditions of probation need only be proved by a preponderance of the evidence. Section 46-18-203(6), MCA. We review the District Courtþs decision to determine whether it abused its discretion. Butler, 900 P.2d at 910 (citing Lundquist, 825 P.2d at 206.)

The District Court revoked Lindemanþs suspended sentence because it found that he failed to complete a sex offender treatment program with a certified specialist as required by the second condition of his probation:

2) The Defendant shall continue to participate in sex offender treatment approved by the Probation department, and that he continue in the same treatment until he has been satisfactorily discharged by a certified treatment specialist and approved by the Probation Department.

Lindeman argues that the District Court abused its discretion when it revoked his suspended sentence because it failed to consider several þunique factorsþ including the following: (1) he successfully completed a sex offender treatment program with the approval of his probation officers; (2) he cannot afford to complete another sex offender treatment program; (3) he has a terminal, rare form of asthma; (4) he is a benefit to the community because he has devoted himself to a menþs church group; (5) the State made no effort for over seven years after he left Dr. Scolattiþs program to have him removed

from the community; and (6) he has consistently followed all other rules of his probation and has committed no crime subsequent to his conviction. We examine each of these in turn.

### (1) Alleged Completion of Treatment Program

Although couched as merely the first "factor," Lindeman is actually challenging the District Court's finding that he failed to successfully complete the required sex offender treatment program. But the evidence in support of the court's finding is overwhelming and, for the most part, uncontroverted.

First, Lindeman does not dispute the fact that he failed to complete the SABER program run by Dr. Scolatti. Dr. Scolatti terminated him when he violated the program's rule regarding a sexual relationship with a younger person.

Second, although he received some treatment from Dr. Oakwright, Dr. Oakwright was not a certified treatment specialist as required by the condition of probation. He was not a member of the National Association for Treatment of Sexual Abusers, the Montana Sex Offenders Treatment Association, or any other equivalent state program. Indeed, Dr. Oakwright himself admitted to one of his probation officers that he was not qualified to treat sex offenders. Lindeman points to no evidence that Dr. Oakwright was a certified specialist or otherwise qualified to treat sex offenders.

Additionally, the treatment Dr. Oakwright actually provided was insufficient. It did not meet the standards of the state and national programs, and Dr. Oakwright had described the treatment as only "educational" in nature. Lindeman attended only ten to twelve couples counseling sessions with his wife, and he attended no group therapy sessions. The experts, including Dr. Scolatti, Andy Hudak and Ron Silvers testified that the only type of sex offender treatment that meets Montana and national standards involves group therapy with other sex offenders. Educational counseling in the presence of a wife does not qualify and is ineffective. Additionally, treatment can take years. For example, Silvers testified that his program lasts an average of three to five years. Lindeman points to no evidence that indicates that the treatment he received from Dr. Oakwright was sufficient.

Finally, Dr. Oakwright himself stated that Lindeman had not successfully completed even the treatment that he recommended. Although there was some confusion over a letter he had written stating that Lindeman had "graduated," Dr. Oakwright explained to subsequent probation officers, that Lindeman had dropped out his program without notice and that he had not completed treatment. He had only completed a so-called educational treatment program and required more counseling. In his opinion, Lindeman had a "significant sexual addiction which . . . survived throughout his treatment."

Lindeman received no additional treatment from any other source. We hold that the District Court's finding that Lindeman violated the condition of his probation is supported by the preponderance of the evidence.

**(2) Alleged Inability To Pay For Treatment**

Lindemanþs protests that he cannot afford treatment are equally without merit. At no time was he denied treatment for monetary reasons. Although he still owed some money to Dr. Scolatti when treatment was terminated, he was not terminated from the program for that reason. Similarly, Silvers denied him entrance to his program not for monetary reasons, but because Lindeman was uncooperative and unwilling to undergo treatment. Lindeman refused to even sign a medical release to enable Silvers to obtain records from Dr. Scolatti. Evidence in the record indicated that in the past Silver accepted patients who could not pay. In this case, however, Lindeman never approached him or anyone regarding an alleged inability to pay.

Finally, in January 1996, Hudak had agreed to allow Lindeman to undergo an evaluation for a reduced fee of $150.00. He also gave Lindeman three months to pay. Lindeman never indicated that paying this amount was out of his financial reach. The evidence suggests that Lindeman was simply unwilling to undergo treatment.

**(3) Alleged Terminal Illness**

Lindeman argues that the District Court failed to adequately consider the fact that he has a terminal form of asthma. Although there is some evidence that he has a medical condition which might shorten his life expectancy, there is no evidence in the record that the condition is terminal or that it prevented him from attending an approved sex offender therapy program.

**(4) Alleged Membership In Prayer Group**

Lindeman next contends that he belongs to a menþs prayer group and is therefore a benefit to his community. This, however, is no substitute for the required therapy. It does not excuse the requirement that he successfully complete an approved sex offender treatment program. It does not justify his failure to take steps to enter Hudakþs program in 1996.

**(5) Stateþs Delay In Filing Petition To Revoke Suspended Sentence**

Lindeman complains that the State made no effort for over seven years after Dr. Scolatti terminated him from the SABER program to have him removed from the community. Dr. Scolatti terminated Lindeman from the program in March 1991, and it was not until January 1996 that the State held an intervention hearing and ordered Lindeman once again to seek treatment. In May 1996, the State filed the petition to revoke. Although it was thus five years, and not seven years as asserted by Lindeman, Lindeman is nonetheless correct in noting that the State delayed for several years before taking action.

There is no doubt but that Lindeman fell through the cracks in the system at nearly every turn. The first occurred when Lindeman began treatment with Dr. Oakwright. His

probation officer at the time neither verified whether Dr. Oakwright was a certified treatment specialist as required by the condition of probation, nor ensured that the program was approved by the probation department.  A second major mistake occurred when a different probation officer concurred with Lindeman's request to modify the terms of probation to allow him unsupervised contact with his then two-year old daughter.  The probation officer  apparently failed to determine whether in fact Lindeman had actually completed an approved sex offender treatment program by a certified specialist.  Although Lindeman went through a string of probation officers, only two picked up on the fact that he had not completed treatment.  In 1993, one probation officer sought not only to protect Lindeman's daughter from unsupervised contact with Lindeman, but attempted to get Lindeman back into treatment.  But Lindeman once again slipped through the cracks when he moved.  Either this information was not communicated to the next probation officer or the next probation officer did not follow through on the information.  In either case, there again was a breakdown in the system.  It was not until late 1995 that his latest probation officer again discovered Lindeman's failure to complete treatment.

When the State finally discovered this fact, Lindeman's suspended sentence was not immediately revoked.  Rather, Lindeman was given yet one more chance to enter an approved treatment program.  Despite this new opportunity, he failed to so much as complete the entrance evaluation, once again demonstrating his hostility and unwillingness to undergo treatment.   This time, however, the State did not delay.  It took immediate steps to have him removed from the community.

Regardless of the State's original lengthy delay, the fact remains that Lindeman was an untreated sex offender who posed a danger to the community and in particular to his young daughter.  He refused to get treatment in violation of the condition of his probation, in spite of being given a third chance in 1996.  The District Court did not abuse its discretion by revoking his suspended sentence notwithstanding the State's original delay.

(6)  Allegedly Following All Other Conditions of Probation

Sixth, Lindeman argues that he has consistently followed all other rules of his probation and has committed no crime subsequent to his conviction.  At the revocation hearing, the State presented evidence that Lindeman had violated other conditions of probation by possessing firearms in his basement and by allowing a teenage boy to live in his home.  The District Court made no findings of fact regarding those two alleged violations.  We need not address whether or not Lindeman in fact followed all other rules of his probation.  The fact remains that he already violated one condition of probation when he refused to enter and complete a treatment program.  We have held in the past that þno violation of a probation agreement is minor.þ  Butler, 900 P.2d at 911

(citing
State v. Rogers (1989), 239 Mont. 327, 330, 779 P.2d 927, 929). We hold that even without other violations, the District Court did not abuse its discretion in revoking his suspended sentence based upon the one violation.

Lindeman nonetheless insists that the facts in his case are analogous to those in State v. Lundquist (1992), 251 Mont. 329, 825 P.2d 204, and that based upon that case this Court should reverse the District Court. In Lundquist, the defendant had been terminated from his sex offender treatment program because he had not paid the outstanding balance of $1,260.00 owed his therapist. Lundquist, 825 P.2d at 205. Six months after his termination from the program, the therapist provided a second reason for his termination and stated that the defendant had not participated in the written portion of the program. Lundquist, 825 P.2d at 206. At the revocation hearing, the therapist also testified that he originally wondered whether Lundquist was psychotic, because the defendant claimed to have undergone a religious metamorphosis and spoke to angels who guided him. Eventually the therapist concluded that Lundquist was not psychotic, but was simply following his system of religious beliefs. Lundquist, 825 P.2d at 206.

Other evidence, indicated that the defendant in Lundquist had attempted to comply with the condition of his suspended sentence. Prior to his termination from the program, the defendant had faithfully attended seventy-six group therapy sessions and thirteen individual sessions--each of which required a 150-mile round trip from Lundquistþs residence in Philipsburg, Montana, to the therapist in Missoula, Montana. Lundquist, 825 P.2d at 205. Although he had an outstanding balance for the counseling sessions, he had already paid the therapist a total of $2,450 in counseling fees. Lundquist, 825 P.2d at 205. Finally, the therapist testified that the defendant realized that child molestation is bad and that the defendant posed only a low to moderate probability of reoffending. Lundquist, 825 P.2d at 206.

Based upon the facts in that case, we held that the District Court abused its discretion in revoking the suspended sentence. To the extent the District Court based its decision on the defendantþs failure to pay fees, we held that it was unreasonable in light of his low income and the fees already paid. Lundquist, 825 P.2d at 206. We noted that the District Court could simply have required the defendant to offer a payment plan or to find another outpatient sex offender treatment program. Lundquist, 825 P.2d at 207. To the extent revocation was based upon the defendantþs religious beliefs, we held that the decision contravened his right to free exercise of religion. Lundquist, 825 P.2d at

206. We further noted that the defendant had complied fully with the terms of his probation and that the State waited six months before taking steps to remove him from the community. Lundquist, 825 P.2d at 206-07.

The facts in Lundquist differ significantly from those in this case. Unlike the defendant in Lundquist, Lindeman was not terminated from the SABER program for either financial or religious reasons. He was terminated because he failed to abide by the programþs rules. Moreover, the defendant in Lundquist posed a low to moderate risk in the community, whereas Dr. Scolatti characterized Lindeman as þone of the most dangerous menþ with whom he had ever worked. Finally, in Lundquist, the defendant offered to make a payment plan for readmission to the program or to seek another treatment plan. In this case, Lindeman was unwilling and uncooperative. He insisted to Silvers in 1993 that he did not need treatment and refused to sign a medical release. In 1996 when he was given one last chance to seek treatment from Hudak, he refused. This is not a situation as in Lundquist where the defendant did everything he could to abide by the terms of probation but simply had difficulty paying.

The one fact in this case that is similar to the Lundquist case is the fact that the State waited a significant period of time after he was terminated from the SABER program before taking steps to remove him from the community. However, the State took immediate action in 1996 after Lindeman failed to enter treatment as ordered at his intervention hearing. As we elaborated earlier, the Stateþs original delay does not justify liberating an untreated sex offender, particularly when the State gave Lindeman yet another opportunity in 1996 to comply.

As we have stated in the past:

The inquiry at any probation revocation hearing is whether the purposes of rehabilitation are being achieved, and whether, by virtue of subsequent criminal conduct or evidence that the defendantþs behavior was not in compliance with the rules and objectives of his probation, the purposes of probation are best served by continued liberty or by incarceration.

State v. Robinson (1980), 190 Mont. 145, 148, 619 P.2d 813, 815 (citation omitted). In this case, the purposes of rehabilitation were not being achieved, and Lindeman had not complied with the rules of his probation. We hold that the District Court did not abuse its discretion when it revoked Lindemanþs suspended sentence.

ISSUE THREE

Did the District Court err in reserving its determination of Lindemanþs parole eligibility?

In its 1989 judgment, the District Court specifically reserved the right under õ 46-18-202, MCA, to impose the restriction that Lindeman be ineligible for parole while serving his term, in the event that Lindeman ever violated a condition of probation

that resulted in revocation of his suspended sentence. Subsequently, upon revoking Lindemanþs suspended sentence in 1996, the District Court ordered that Lindeman be ineligible for parole until he successfully completed the sex offender treatment program at the Montana State Prison.Lindeman cites State v. Finley (1996), 276 Mont. 126, 915 P.2d 208, and contends that the District Court lacked statutory authority to reserve the right to restrict his eligibility for parole and later impose the restriction upon revoking the suspended sentence. The State concedes that Finley controls and that the District Court had no such authority. We agree.

When a court revokes the suspended sentence, it has the authority to require the defendant to serve either the sentence imposed or a lesser sentence. It has no authority to impose additional restrictions. Section 46-18-203(7)(c), MCA. The restrictions of Lindemanþs parole eligibility exceed the authority of õ 46-18-203(7), MCA. Furthermore, õ 46-18-202, MCA, the statutory provision relied upon by the District Court when reserving the right to impose the restriction, applies only to the original sentence under õ 46-18-201, MCA. The District Court has no authority to reserve the right to impose such a restriction upon subsequently revoking the suspended sentence. For that very reason in Finley, we reversed the portion of the courtþs judgment that reserved the right to restrict the defendantþs parole eligibility. Finley, 915 P.2d at 222. In this case too, we hold that the District Court erred in reserving its determination of Lindemanþs parole eligibility.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ J. A. TURNAGE
/S/ JAMES C. NELSON
/S/ TERRY N. TRIEWEILER
/S/ JIM REGNIER