# IN THE SUPREME COURT, STATE OF WYOMING

## 2016 WY 33

OCTOBER TERM, A.D. 2015

March 9, 2016

MICHAEL ALLAN LINDSTROM,

Appellant
(Defendant),

v.

S-15-0203

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Johnson County*
*The Honorable William J. Edelman, Judge*

*Representing Appellant:*

> *Office of the State Public Defender: Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel.*

*Representing Appellee:*

> *Peter K. Michael, Attorney General; David L. Delicath, Deputy Attorney General; Christyne M. Martens, Senior Assistant Attorney General; Caitlin F. Young, Assistant Attorney General.*

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BURKE, Chief Justice.**

[¶1] Appellant, Michael Allan Lindstrom, challenges the district court's denial of his motion for a new trial. We affirm.

## *ISSUE*

[¶2] Appellant presents the following issue:

> Did the district court abuse its discretion in denying Appellant's motion for a new trial?

## *FACTS*

[¶3] In 2013, Appellant was convicted of ten felonies for acts perpetrated against his ex-girlfriend, TR, their son, PR, and Appellant's six-year-old second cousin, CS. *Lindstrom v. State*, 2015 WY 28, ¶¶ 3-13, 343 P.3d 792, 794-96 (Wyo. 2015). With respect to the acts committed against TR and PR, TR testified at trial to the following events:

> TR testified that Mr. Lindstrom came to her home in June 2012. They sat on the couch making small talk and watching PR play. Mr. Lindstrom asked TR if they could be in a relationship again, TR said no and he asked if he could at least "get a piece of ass." She again said no and Mr. Lindstrom called her a bitch. TR took PR to his room and Mr. Lindstrom followed. PR began to show Mr. Lindstrom his room and his toys. After watching them for a few minutes, TR left them alone.

> TR came back to the room about thirty minutes later when she heard PR say, "I don't want to do that." The door was shut, she opened it and she saw Mr. Lindstrom and PR in PR's bed. TR testified that it looked like Mr. Lindstrom was pulling up his pants and PR's pants. She asked them what they were doing and Mr. Lindstrom said they were watching a movie. PR ran to her and grabbed hold of her waist. He was trembling. She picked him up and he whispered in her ear that Mr. Lindstrom had made him touch his penis and pretend it was a Popsicle. She asked Mr. Lindstrom what he had done and he denied doing anything. They argued and she told Mr. Lindstrom that he needed to leave.

1

> TR threatened to call the police and, carrying PR, headed to her bedroom to get her cell phone. She made it to the bathroom, put PR down and told him to go in the bathroom and lock the door. Mr. Lindstrom followed her, grabbed her around the throat and said if she told anyone he would kill her. He shoved her against the wall and told PR to open the bathroom door. PR complied and Mr. Lindstrom told TR to go into the bathroom. Mr. Lindstrom made TR perform fellatio on him and then told her to touch PR's penis. She refused and he slapped her. She hit him in the face and he began pulling down her pants and underwear. He grabbed PR's hand and told him to touch her. She pushed PR's hand away. Mr. Lindstrom forced her head down onto his penis. Then he held a Swiss army knife to her throat and told her to do the same thing to PR or he would kill her. After she complied, Mr. Lindstrom made TR and PR get into the shower and he urinated on TR. Mr. Lindstrom then got dressed and stepped out of the bathroom. TR locked the door. Mr. Lindstrom pounded on the door, cussing and yelling that he was going to kill TR. Finally, Mr. Lindstrom left the house.

*Id.*, ¶¶ 8-10, 343 P.3d at 795-96. The State also presented deposition testimony of CS, who stated that Appellant had on different occasions inserted his finger in her anus several times, made her touch his penis, and made her perform fellatio on him. *Id.*, ¶ 7, 343 P.3d at 795. In addition to the testimony of TR and CS, the State presented the testimony of DFS employees and police officers who were involved in investigating the allegations against Appellant. Their testimony about their interviews with CS, PR, and TR tended to corroborate the allegations of child abuse and sexual assault. The State also presented expert testimony tending to show that CS's behavior was consistent with that of a child who had been sexually abused. *Id.*, ¶ 12, 343 P.3d at 796.

[¶4] After a five-day trial, the jury found Appellant guilty of two counts of first-degree sexual assault and two counts of aggravated assault and battery for acts committed against TR. He was found guilty of one count of first-degree sexual abuse of a minor and one count of second-degree sexual abuse of a minor for acts committed against PR. He was also found guilty of two counts of first-degree sexual abuse of a minor and two counts of second-degree sexual abuse of a minor for acts committed against CS. The district court sentenced Appellant to six terms of life in prison without the possibility of parole on the convictions for first- and second-degree sexual abuse of a minor, and to four terms of forty to fifty years imprisonment on the convictions for first-degree sexual assault and aggravated assault and battery. *Id.*, ¶ 13, 343 P.3d at 796. Appellant filed a direct appeal from his convictions and we affirmed. *Id.*, ¶ 1, 343 P.3d at 794.

[¶5]   In April 2015, TR wrote a letter to Appellant's grandmother stating that Appellant was innocent and that she had lied when testifying at trial.  Appellant's grandmother contacted law enforcement and arranged a meeting at the Dash Inn between herself, TR, and investigator Andy Fraser.  Following the meeting, TR submitted an affidavit stating that she had testified falsely at trial.

[¶6]   In May 2015, Appellant initiated the present matter by filing a motion for a new trial based on TR's recantation.  In response to the motion for a new trial, the State claimed that TR's recantation was not reliable.  The State noted that TR had changed her story multiple times prior to trial, and that she had been cross-examined at trial about her changing story.  The State also noted that, after submitting her affidavit, TR changed her story yet again and stated that her trial testimony was true and that her affidavit was false.

[¶7]   A hearing on Appellant's motion for a new trial was held on June 10, 2015.  TR testified that her letter to Appellant's grandmother and her affidavit were false.  TR stated that Appellant's grandmother threatened her before she sent the letter stating that she had testified falsely and that she was under duress when she signed the affidavit.  Mr. Fraser also testified at the hearing and stated that TR was very nervous when she signed the affidavit.  TR testified that she had previously recanted her statements prior to trial and that she had been cross-examined about her previous recantations at trial.

[¶8]   Following the hearing, the district court denied Appellant's motion.  The court determined that the evidence did not constitute new evidence coming to knowledge since the trial.  The court also concluded the evidence was not material and would not produce a different verdict.  It further concluded the evidence was cumulative because evidence relating to TR's credibility had been presented at trial.  Finally, the court noted that TR "indicated that her trial testimony was truthful" and that Appellant "failed to provide sufficient proof to the contrary."  This appeal followed.

## DISCUSSION

[¶9]   New trials in criminal cases are allowed if "required in the interest of justice." W.R.Cr.P. 33(a).  We generally review the district court's decision on a motion for a new trial for abuse of discretion.  *Mendoza v. State*, 2013 WY 55, ¶ 8, 300 P.3d 487, 489 (Wyo. 2013); *Hicks v. State*, 2008 WY 83, ¶ 30, 187 P.3d 877, 883 (Wyo. 2008).  A district court abuses its discretion when it could not have reasonably concluded as it did. *Mendoza*, ¶ 8, 300 P.3d at 489.

> In determining whether there has been an abuse of discretion, we focus on the "reasonableness of the choice made by the trial court." *Vaughn* [*v. State*], 962 P.2d 149, 151 (Wyo. 1998). If the trial court could reasonably conclude as it did

and the ruling is one based on sound judgment with regard to what is right under the circumstances, it will not be disturbed absent a showing that some facet of the ruling is arbitrary or capricious.

*Miller v. Beyer*, 2014 WY 84, ¶ 14, 329 P.3d 956, 961 (Wyo. 2014) (quoting *Dollarhide v. Bancroft*, 2010 WY 126, ¶ 4, 239 P.3d 1168, 1170 (Wyo. 2010)).

[¶10] A defendant who seeks a new trial based on newly discovered evidence must demonstrate the following:

> (1) [t]hat the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that it did not come sooner; (3) that it is so material that it would probably produce a different verdict, if the new trial were granted; and (4) that it is not cumulative, viz., speaking to facts in relation to which there was evidence at the trial.

*Davis v. State*, 2005 WY 93, ¶ 45, 117 P.3d 454, 471 (Wyo. 2005) (quoting *Opie v. State*, 422 P.2d 84, 85 (Wyo. 1967)). We have repeatedly held that, in cases involving a motion for a new trial based on recanted testimony, the weight to be given to such testimony is for the trial court to determine:

> We see no reason for deviating from the basic rule for evaluating district court decisions on motions for new trial. *Opie v. State*, 422 P.2d [84,] 85 [(Wyo. 1967)]. However, we will enlarge on that general rule somewhat to provide additional guidance in cases, such as this, which involve recanted testimony. To that purpose, we agree with the Supreme Court of Montana that granting a person of questionable credibility and motive carte blanche to overturn the determination of a jury operating within the bounds of our constitutional protections is not conducive to the sound administration of justice. *State v. Perry*, 232 Mont. 455, 758 P.2d 268, 275 (1988). Therefore, we adopt the following rule espoused by that court, as well as several others:
>
>> In light of the inherent suspicion surrounding recanted testimony and the public interest in swift and sure justice, we believe the better reasoned approach to be that adopted by the Supreme Court of Kansas:
>>
>> When a new trial is sought on the basis of recanting

4

> testimony of a prosecution witness, the weight to be given such testimony is for the trial judge passing on the motion for a new trial to determine. The trial judge is required to grant a new trial only when he [or she] is satisfied the recantation of the witness is true. . . . *Id.* 758 P.2d at 275; (quoting *State v. Norman*, 232 Kan. 102, 652 P.2d 683, 689 (1982)). *See also Thacker v. Commonwealth*, 453 S.W.2d 566, 568 (Ky. 1970).

*Davis*, ¶ 45, 117 P.3d at 471 (quoting *Brown v. State*, 816 P.2d 818, 822 (Wyo. 1991)) (quotation marks omitted). Further, we have stated that recanted testimony

> should be viewed with the utmost suspicion, *Sims v. State*, Wyo. 1972, 495 P.2d 256, and when a motion for a new trial, based upon recantation, is denied by the trial court, this court will ordinarily be bound by that decision. *Espy v. State*, 1939, 54 Wyo. 291, 92 P.2d 549, 559. In *Flaim v. State*, Wyo. 1971, 488 P.2d 153, this court quoted the following language which is most appropriate to this case: "'There is no form of proof so unreliable as recanting testimony. . . . Those experienced in the administration of the criminal law know well its untrustworthy character.'" 488 P.2d at 155.

*Davis*, ¶ 45, 117 P.3d at 471 (quoting *Jones v. State*, 568 P.2d 837, 854 (Wyo. 1977)).

[¶11] In *State v. Clark*, 2005 MT 330, ¶ 32, 125 P.3d 1099, 1105 (Mont. 2005), the Montana Supreme Court overruled *State v. Perry* to the extent that it stood for the proposition that a "trial judge is required to grant a new trial only when he is satisfied the recantation of the witness is true." The Court stated that "the plain reading of the *Perry* rule is troublesome, for it inappropriately places the judge in the role of fact-finder, inevitably, in some cases, on the key matter of the guilt or innocence of the accused." *Id.* However, the Court explicitly retained that part of the rule providing that "When a new trial is sought on the basis of recanting testimony of a prosecution witness, the weight to be given such testimony is for the trial judge passing on the motion for a new trial to determine." *Id.*, ¶ 33, 125 P.3d at 1105. It held that this consideration continued to be inherent to the Court's multi-factor test for determining whether a new trial should be granted on the basis of newly discovered evidence. *Id.*, ¶¶ 33, 34, 125 P.3d at 1105. We agree with this reasoning, and find that it applies with equal force to Wyoming's multi-factor test. Indeed, considerations of the credibility of the recanting witness are intrinsic to the third element of our test for determining whether a new trial is warranted based on newly discovered evidence: whether the evidence is so material that it would probably produce a different verdict. Accordingly, in line with the Montana Supreme Court, we conclude that a determination of the credibility of the recanting witness is an important,

but not exclusive, factor to be considered when determining whether a new trial is warranted. Our analysis, however, does not alter the fact that recanted testimony should be viewed with the "utmost suspicion," and when a motion for a new trial based on recanted testimony is denied by the trial court, we will ordinarily be bound by that decision. With this standard in mind, we turn to the arguments presented in this appeal.

[¶12] Appellant contends a jury should be allowed to assess the fact "that TR totally rejected her trial testimony." Appellant also claims that a jury should be permitted to assess TR's "recantation of her recantation." According to Appellant, if TR's recantation should not be believed, "then it may logically follow that she was unbelievable at the numerous other times she changed her story." Appellant claims that this evidence would likely result in a different verdict. We do not agree.

[¶13] As discussed above, the weight to be given to recanting testimony is for the trial judge to determine. The district court determined that TR's recantation was not credible based on the evidence presented at the motion hearing. TR testified that the letter she wrote to Appellant's grandmother and her subsequent affidavit, stating that Appellant was innocent, were false. She stated that she wrote the letter because Appellant's grandmother had threatened her by stating that she "needed to do something about" Appellant's imprisonment and that, if she didn't, she "probably wouldn't want to be in Buffalo." Additionally, TR stated that she was nervous when she signed the affidavit and felt that she was under duress. Mr. Fraser confirmed that TR was very nervous when she signed the affidavit. Ultimately, TR testified that her trial testimony, in which she stated that Appellant had abused her and her son, was true.

[¶14] Based on the evidence presented at the hearing, the district court determined that TR's post-trial recantation was motivated by a fear of Appellant's grandmother. The court stated that

> [Appellant's grandmother] appears to be the driving force in all of this. She is the one who gets a hold of Mr. Fraser. She is the one who gets a hold of [TR]. She shows up at the meeting at the Dash Inn.
>
> And it's uncontroverted that by some coincidence, while sitting at the Dash Inn talking about Mr. Lindstrom's case, Mr. Lindstrom ends up on the phone.
>
> And it is clear to this Court that there is substantial evidence to support the proposition that [Appellant's grandmother] is working behind the scenes here and pushing [TR] to say on another occasion that she lied about this.

6

> And Mr. Fraser even corroborates the fact that at the conclusion of the meeting that he drops [TR] off over at [Appellant's grandmother's] house.

It is clear from the district court's statements that it did not find TR's post-trial recantation to be credible. We defer to the district court's determination.

[¶15] Further, we agree with the district court's assessment that TR's "recantation of her recantation" constituted cumulative evidence relating to TR's credibility. TR acknowledged in her testimony at the motion hearing that she had changed her stories to investigators and police multiple times during the investigation of Appellant's crimes. She stated that she had been cross-examined at trial about the fact that she had recanted her story at least two times to law enforcement. As noted by the court,

> [TR]'s veracity was a central point in the defense's case and in fact they called her to testify in addition to the State calling her to testify.
>
> And on multiple occasions the fact that she had in one breath said this stuff happened and then in the next breath said it didn't happen was brought up before the jury.

Considering the applicable standard of review and the evidence contained in the record, we are unable to conclude the district court abused its discretion in denying Appellant's motion for a new trial.

[¶16] Affirmed.